# COURT OF APPEALS.

WILLIAM F. HAWKINS, respondent, agt. CLIFFORD PEMBER-
TON, *el al.*, apellants.

Where an auctioneer states, at the time of sale, "here are 25 barrels of blue vitriol,
sound and in good order," it is a *warranty* to the purchaser that the article is
sound and in good order, and that it is *blue vitriol*.
And it is error for the court below on the trial to withhold this evidence of warranty
from the jury, when properly requested to submit it to them.

APPEAL by the defendants from a judgment rendered
against them, at the general term of the superior court of the
city of New York.

The following facts appeared upon the trial: On the 16th
of January, 1867, Burdeth, Jones & Co., who were auction-
eers in the city of New York, sold for the plaintiff, twenty-
five barrels of what was called blue vitriol. The auctioneer,
at the time of the sale, the plaintiff being present, stated
that the article was "blue vitriol, sound and in good order."
The defendants, being the highest bidders, became the pur-
chasers at eight cents per pound, relying upon the represen-
tation of the auctioneer that it was "blue vitriol," and
believing that it was such. At the time of the purchase the
defendants examined some of it, and it had the appearance
of blue vitriol, being blue. They took a sample of it away,
and the next morning found that it had turned nearly all
white at the surface from exposure to the air, and it was not
blue vitriol, and they immediately notified the plaintiff that
they would not take it. The plaintiff then notified them
that he should sell it upon their account, and look to them
for any loss. He accordingly did sell it at auction for about

five cents per pound, and the loss was over $400, which this action was brought to recover. It was subsequently discovered by chemical analysis that the article contained only from 17. to 25 per cent. of blue vitriol, chemically called sulphate of copper, and that the balance was mostly green vitriol, chemically called sulphate of iron or copperas. It was not possible at the time of the sale to discover by any examination which could then be made the true character of this article. It could be discovered by exposure for some hours to the air or by chemical analysis. This article had just been imported from Germany, and it was shown by a manufacturing chemist, who formerly resided in Germany, that it was known there as Salzburger vitriol, and not as blue vitriol. A chemist, sworn on behalf of the plaintiff, testified that it was not blue vitriol nor white vitriol, but chemically speaking, mixed vitriol. While sulphate of copper was worth from 8 to 9½ cents per pound, sulphate of iron was worth only 1½ cents per pound.

The defendants in this action set up warranty and fraud in the sale of the article ; and at the close of the evidence upon the trial requested to go to the jury upon both grounds. The court refused the request, and directed a verdict for the plaintiff, and ordered the exceptions to be heard in the first instance at the general term. The cause was heard at the general term, and judgment ordered for plaintiff upon the verdict. From the judgment entered, the defendants appealed to this court.

IRA G. WARREN, *for appellants.*

I. The Court erred in not submitting the question to the jury, whether the defendants, when they represented this to be "twenty-five barrels of blue vitriol, sound and in good order," intended to warrant it to be so. The question, whether the words used were understood and intended by the parties as a warranty, is a question of fact for the jury,

and should be left to them to determine. (*Duffee* agt. *Mason*, 8 *Cowen*, 25; *Whitney* agt. *Sutton*, 10 *Wend.*, 412; *Cook* agt. *Mosley*, 13 *Wend.*, 277; *Stryker* agt. *Bergan*, 15 *Wend.*, 490; *Rogers* agt. *Acherman*, 22 *Barb.*, 134; *Richardson* agt. *Mason*, 53 *Barb.*, 601; *Blackeman* agt. *Mackay*, 1 *Hilt.*, 226; *Bradford* agt. *Bush*, 10 *Ala.*, *N. S.*, 386; *Manill* agt. *Wallace*, 9 *N. H.*, 111.)

Where the seller said, at the time of the sale, "the cow is all right," it was held to be a question for the jury, whether these words were meant or intended as a warranty of her soundness, although, as in this case, the words were undisputed. (*Tottle* agt. *Brown*, 4 *Gray*, 457; *Foster* agt. *Caldwell*, 18 *Vt.*, 176.)

The representation was "here are 25 barrels of blue vitriol, sound and in good order."

It is a positive affirmation that the 25 barrels contained blue vitriol, that it was sound, and that it was in good order.

No particular form of words is essential to constitute a warranty. Any assertion of the vender is relied on by the vendee and understood by both parties as an 'absolute assertion, amounts to a warranty, and should be enforced as such. (*Chapman* agt. *Murch*, 19 *Johns.*, 290; *Sweet* agt. *Bradley*, 24 *Barb.*, 549; *Roberts* agt. *Morgan*, 2 *Cow.*, 438; *Wilbur* agt. *Cartwright*, 44 *Barb.*, 536; *Carly* agt. *Wilkins*, 6 *Barb.*, 557; *Holman* agt. *Dord*, 12 *Barb.*, 336; *Munson* agt. *Lombard*, 18 *Pick.*, 66; *Beeman* agt. *Buck*, 3 *Vt.*, 53.)

In a case in Massachusetts an auctioneer sold an article as "Manilla indigo," which in point of fact was not Manilla indigo, but a skillfully prepared compound so nearly resembling it that an expert could not detect the fraud by examination.

The court held that although the party examined it before purchase, yet the representation that it was "Manilla indigo" was a warranty. (*Henshaw* agt. *Robbins*, 9 *Metc.*, 83; *Story on Sales*, § 355, § 357, *note* 1.)

Hawkins agt. Pemberton.

If a vendor should, in selling a bar of German silver, affirm it to be silver, and the purchaser should thereby be deceived into the belief that it was Mexican silver, the sale would be void. (*Story on Sales*, § 167.)

This we say was a warranty that this article was "blue vitriol." The word blue vitriol has a strict and definite meaning. It means sulphate of copper. (*Worcester's Dictionary, page* 154; *See also page* 1635, "*Vitriol.*" *See plaintiffs' testimony, bottom of page* 5, *showing that he so understood it.*)

It will hardly do to construe the auctioneer's statement as the court has at fol. 135, by stating that it was called "blue vitriol," as being its commercial designation or as being vitriol of a blue color.

"Blue vitriol" means "sulphate of copper" as much as the word "diamond" means pure carbon, and not paste. There is no evidence that that was its commercial designation. The only evidence upon that subject is that its commercial designation was Salzberger vitriol.

As to whether in point of fact it was or was not blue vitriol, there is a conflict of evidence. The defendants' evidence shows that it was a German article, wholly unknown in this country, but known in Germany as Salzberger vitriol.

Englehardt swears he would not call it blue vitriol. Pfizer swears it is not blue vitriol. Poley swears it is not blue vitriol. Toch swears it was not blue vitriol. Webster swears it was not blue vitriol. The chemical analysis shows it was not blue vitriol. On the other hand, the plaintiff swears it was blue vitriol.

He was permitted to put an invoice in evidence against our objection, in which the article is called sulphate of copper.

On this evidence the court at general term argue, and finally decide, that it was in fact blue vitriol.

We should have been better satisfied if the jury had been

permitted to decide this conflicting question of fact, instead of the court, as we had five witnesses, against one, swearing that it was not blue vitriol.

The court in their opinion, state, "It was known as Salzberger vitriol in Germany, where it was manufactured, and as mixed vitriol in this country amongst chemists."

We claim that this was warranted to be blue vitriol, and that it was not, is a fact beyond dispute.

II. If this was blue vitriol, was it "sound and in good order," as it was represented?

Is an article sound when there exists a defect which the air will cause to develop itself so as to destroy the article in twelve hours?

Was it blue vitriol, sound and in good order, when it was mixed with an article which nothing but a chemical analysis could detect, that was certain to destroy it within twelve hours after it was exposed to the air? The court say, that "The liability of such compound to effloresce when exposed to the air was not a defect, because it was a natural quality of the sulphate of iron, which was one of its elements." It is not a natural quality of blue vitriol to effloresce, however, and sulphate of iron is not one of the elements of blue vitriol.

The plaintiff's representation was "blue vitriol," "sound and in good order." In point of fact, instead of its being "blue vitriol," three-quarters of it was an entirely different element, liable and certain to effloresce on exposure to the atmosphere. The court say that this foreign substance was not a defect, because to effloresce was one of its natural qualities. Because one of the natural qualities of the element of destruction mixed with the blue vitriol is to destroy, therefore the "blue vitriol" was sound and in good order. We cannot see the logic or justice of this reasoning.

The court say the word "sound" applies to condition only, and is opposed to defective, decaying or injured.

Was this vitriol defective; was it injured; was it in good

condition, containing within itself a sure and certain element of its own destruction?

If a man sells me a steam boiler and warrants it "sound and in good order," and it turns out that there are some sheets of colored lead that could not be detected, so that finally it explodes, is it an answer to say that it was a steam boiler "sound and in good order," but of an inferior quality. because it is one of the natural qualities of lead to explode under a high pressure? Would not the word "sound" apply to the material of which the article was made? Is it "sound and in good order" if made of a defective and destructive material, so manipulated as to deceive the most practised eye?

"Blue vitriol, sound and in good order," will not effloresce.

The rules of the common law ought to be flexible enough to keep pace with the rapid march of chemical science and the untiring ingenuity of rogues.

When oride cannot be distinguished from gold; when paste is as brilliant and beautiful as the diamond; when an ordinary article of commerce, like this, can be so manipulated as to deceive the most skillful expert; when deception rules the hour, and half we see is fictitious and false, is it possible to apply the law to all this mass of falsehood and fiction and do justice, by clinging to, and feeling our way along by a balustrade of old cases, decided in different times and under other circumstances? Are we to be as firmly bound by their authority as the "pagan deities were supposed to be bound by the decrees of fate," no matter how men and times may have changed? The common law, properly administered, must meet the exigencies of this refined civilization. It must meet the ingenious, fraudulent rascal at the threshold of his inquiry, and not permit him when he buys paste (at the price of paste) to sell it for a diamond, without being liable to make his statement good.

There is a moral beauty in the civil law well worthy of adoption in this great state, which would afford ample and

complete protection to the vendee, and teach vendors that if policy, and not honor, is to govern commercial transactions, honesty is the best.   It would also obviate the necessity of learned judges questioning the morality of the law as laid down in the earlier cases.   (*Op.* PARKER, *J.,* 9 *N. H.,* 113.)

III. There was evidence to go to the jury that the plaintiff knew this was not blue vitriol, and that he knew just the character of the article he was selling.   The court, therefore, erred in refusing to submit that question to the jury.

The court at general term say that there was no request to submit the question of fraud to the jury.

The court omitted to examine the case with its usual care, for this request is distinctly made.

The plaintiff swears that he imported this article ; that it cost him three cents and a half a pound, while blue vitriol could not be bought less than from 8½ to 9 cents per pound, he having imported some by the same ship that brought this article ; is not this conclusive evidence that he knew the character of the article ?

This court says : " If the price is entirely below that of a second article, a presumption would arise that the purchaser was apprised of the defect."   (*Hoe* agt. *Sayborn,* 21 *N. Y.,* 566.   *See opinion.*)

On page 10 of the case, when specimens were handed to the plaintiff, he seemed quite able to tell how much sulphate of iron there was in it.   He purchased it in Cologne in Germany, where it was perfectly well known.

He had imported the same article before.   This lot was a balance of two lots he had previously received.   He imported a different article by the same vessel ; he knew the difference perfectly well between this article and blue vitriol.

Although the price of blue vitrol had not gone down, the plaintiff re-sold it for blue vitriol to Toch four days after, and stood by and saw it sold at 4½ cents per pound, while blue vitriol was worth 9½ cents.   Some of the casks were opened about half an hour before the sale.

Was not this evidence upon which we had a right to go to the jury on the question of fraud?

Fraud can seldom ever be proved by direct evidence, but when so many independent circumstances lead directly to but one conclusion, that the plaintiff knew the character of the article he was selling, we think we were entitled to have that question submitted to the jury.

The fact that the plaintiff purchased it at three cents per pound, when he knew blue vitriol was $8\frac{1}{2}$ to 9 cents, was enough to put him on inquiry and make him liable for the consequences to the same extent as if he had actual knowledge. (*Craig* agt. *Ward*, 3 *Keyes*, 387.)

This was a fraudulent representation, whether the defendant knew it or not. (*Ross* agt. *Mather*, 47 *Barb.*, 582; *Bennet* agt. *Judson*, 21 *N. Y.*, 238.)

He undertook to assert something he knew was false. Something he did not know at the time to be true or false, which turned out to be false. (*Sneider* agt. *Heath*, 3 *Camp.*, 508, 509; *Marsh* agt. *Falkner*, 40 *N. Y.*, 571, *Op. Justice* GROVER.)

In this case the plaintiff must have had some knowledge of this article he sold as blue vitriol. He imported it himself from Germany. He paid but three cents per pound for it He had some of the same lot before this. He kept the casks closed until a few minutes before the sale. On the trial he seemed able to tell it from other vitrol. He did not hesitate to re-sell it as blue vitriol after he was told it was not. He saw it sold for five cents per pound when blue vitriol was worth nine cents.

IV. The plaintiff knew perfectly well the character of this compound. He does not pretend that he was ignorant of the ingredients of which it was composed.

He persisted, on the trial, in calling it blue vitriol, and swearing that it was, notwithstanding a chemical analysis showed that more than eighty per cent. was another article.

He knew perfectly well that blue vitriol was sulphate

of copper. When, therefore, he sold this and called it blue vitriol, did he not intend to induce the purchaser to believe that it was sulphate of copper? (*Johnson* agt. *Hathorn*, 2 *Keyes*, 476.)

It was a question for the jury at all events, as there was abundance of evidence to raise the presumption of fraud. (*Johnson* agt. *Monell*, 2 *Keyes*, 655.)

V. The court, under our objection, admitted in evidence a bill of lading received by the plaintiff from the consignors of this article.

We objected to the reading any statement contained in the bill of lading as to what the article was, which objection was overruled.

The court admitted this evidence, and the general term seem to treat this as evidence of the character of the article.

It was only competent (if at all) to rebut the presumption of fraud, yet the court used it as evidence of what the article was, and took the only question upon which it was competent (if at all) from the jury.

We submit it was not competent for any purpose, and should have been rejected.

VI. The case of *Seixas* agt. *Woods* referred to was decided on the authority of *Chandler* agt. *Lopus*. All that *Chandler* agt. *Lopus* decided was, that because the declaration alleged no warranty it was not good. (2 *Smith's Leading Cases*, 5 *Am.* ed., 238.)

"If the plaintiff in *Chandler* agt. *Lopus* had declared on a warranty of the stone, he would at the present day have probably succeeded." (2 *Smith's Leading Cases*, 5 *Am.* ed., 238, *note.)*

"If not, he would at all events succeed if he were to sue in tort, laying a *scienter*, since the fact of the defendant's being a jeweler would be almost irresistible evidence that he knew his representations to be false." (2 *Smith's Leading Cases*, 239 *and cases cited.)*

In *Seixas* agt. *Wood* there appears to have been no representation made at the time of the sale.

If there had been anything said then it would have been a question whether it was intended as a warranty.

That was a question for the jury and not for the court.

Chancellor KENT says of the case of *Seixas* agt. *Wood*: " There is no doubt of the general rule of law as laid down in that case, the only doubt is, whether it was well applied in that case where there was a description in writing of the article by the vendor, which proved not to be correct, and from which a warranty might have been inferred." (2 *Kent*, *9th ed.*, 644 ; *See Henshaw* agt. *Robbins*, 9 *Metcalf*, 86.)

The same criticism applies to the case of *Sweet* agt. *Colgate.*

Neither of these cases, nor any of this class of cases, are applicable to a case like this, where, at the time of the sale, there is a positive affirmation. " Here are' twenty-five casks of blue vitriol, sound and in good order."

Is it the province of a judge, at trial term, to say this is not intended as a warranty that this is blue vitriol ; that it is sound blue vitriol ; that it is blue vitriol in good order.

The whole language shows that it was intended as a warranty ; but if there was any doubt about it, it should have been left to the jury to say what the parties intended and understood.

VII. We ask that this judgment be reversed and a new trial ordered.

R. S. EMMET, *for respondent.*

*First.*—The facts of this case upon the evidence are undisputed—there is no conflict of testimony. The sale at auction of the blue vitriol was made in the ordinary way, both vendor and purchaser acting in good faith.

I. The representation of the auctioneer that the article was sound and in good order, if it amounted to a warranty,

was only a warranty of its condition, not of its quality or grade. The condition of the goods is not impeached—it is not pretended but that they were in good salable condition.

II. The vendor had no superior knowledge of the condition, quality or grade of the goods than the purchaser. The vendor had every reason to believe that they were of fair merchantable quality.

1. They were so represented to him in the bill of lading and the invoice.

2. They were purchased by him at a fair merchantable price.

3. Similar goods consigned to him by the same invoice had been previously sold by him in the same way, and accepted by the purchasers without complaint.

III. The condition, quality, and grade of the article were patent; it was fully exposed for examination before the sale, and appears to have been fully examined by the purchasers and other bidders.

IV. The purchasers knew that they were buying blue vitriol of an inferior grade and quality.

1. Both defendants so testify.

2. They paid an inferior price—8 cents per pound; the market value of pure blue vitriol was $9\frac{1}{2}$ cents per pound.

3. They were drug brokers, engaged in the business for many years, and both testify as to their knowledge of this particular article.

V. The article was merchantable as blue vitriol—the previous and subsequent sales proved it to be so. It was so in color and general appearance, and of its compounds, sulphate of copper was the greatest value.

*Second.*—When the party, after seeing and examining goods, purchases them at auction or private sale without warranty, and without fraud or misrepresentation on the part of the seller, he takes them wholly at his own risk, and cannot either rescind the purchase or recover damages because the goods proved to be of an inferior quality, or

even of a wholly different character from what they were mutually supposed to be at the time of the purchase. (*Seixas* agt. *Woods*, 2 *Caines*, 48; *Swett* agt. *Colgate*, 20 *Johns.*, 196; *Welsh* agt. *Carter*, 1 *Wend.*, 185; *Carley* agt. *Wilkins*, 6 *Barb.*, 558; *Holden* agt. *Dakin*, 4 *Johns.*, 421.)

I. The reason of this doctrine of *caveat emptor* applies more forcibly to auction than private sales, because the publicity of the sale is a guaranty against fraud in the vendor.

II. The vendor's knowledge that the article is of an inferior quality, and his withholding that fact, are no grounds for the purchaser breaking the bargain. (*Swett* agt. *Colgate*, *ubi sup.*)

III. Naming an article by which to sell it, is not a warranty. It is a mere description of the article. (*Seixas* agt. *Woods*, *ubi sup*; *Swett* agt. *Colgate*, *ubi sup*; *Welsh* agt. *Carter*, *ubi sup.*)

IV. Even if the article be made expressly for the purpose of deception, it would not change the rights of a seller ignorant of the deception. (*Welsh* agt. *Carter*, 1 *Wend.*, 185.)

V. The adulteration of a chemical or commercial article does not change its name—as; for example, adulterated liquors, or coffee or sugar. Nor does such adulteration affect the condition of the article; it may affect its quality. The article may be of inferior quality, but in excellent condition. (*Holden* agt. *Dakin*, 4 *Johns.*, 421.)

VI. The burden of proving fraud is upon the vendee. (*Welsh* agt. *Carter*, 1 *Wend.*, 185.

VII. The price paid implies no warranty. (*Holden* agt. *Dakin*, 4 *Johns.*, 421.)

*Third.*—The bill of lading and invoice were properly admitted in evidence; they were not offered or admitted as a representation of the quality or condition of the article, but as evidence of the vendor's *bona fides*, and as such were competent. (*Swett* agt. *Colgate*, 20 *Johns.*, 196.)

*Fourth.*—The court properly directed a verdict for the plaintiff. There was no question of fact for the jury Although the answer charges fraud, this defense was abandoned; on the trial, not a particle of testimony as to fraud, was offered. The only question in the case was whether, on the undisputed facts, the plaintiff was entitled in law to a recovery. Such appears to have been the opinion of the defendants' counsel on his motion to dismiss the complaint, and such was the view properly taken of the case by the court. (*Seixas* agt. *Woods,* 2 *Caines,* 48; *Swett* agt. *Colgate,* 20 *Johns.,* 195; *Hargous* agt. *Stone,* 5 *N. Y.* 73.)

*Fifth.*—The plaintiff is entitled to judgment on the verdict.

EARL, *Com.*—This action was brought against the defendants, as purchasers of an article called, at the time of the sale, blue vitriol, to recover damages for refusing to take and pay for the same; and, upon the trial, the court refused to submit the evidence to the jury, and ordered a verdict for the plaintiff.

The defendants failed to establish their defense of fraud, and upon that question I think there was no evidence to submit to the jury. We have only, therefore, to consider whether there was evidence tending to show that the plaintiff, at the sale, warranted the article to be blue vitriol, sound and in good order, and that there was a breach of this warranty.

It is unquestioned that there was a warranty that the article was sound and in good order, and I am quite clear that there was no breach of this warranty. It was good, sound Salzberger, or mixed vitriol. It was just as it was made, not damaged or in any way out of order. It was in its natural, normal condition, and it could not be said of such an article that it was unsound.

Did the plaintiff warrant the article to be blue vitriol? It is unquestioned that at the time of the sale, through his auction-

eer, he represented it to be blue vitriol, and that the defendants bought it as such, relying upon that representation.

To constitute a warranty, it is not necessary that the word warranty should be used. It is a general rule that whatever a seller represents at the time of a sale is a warranty. (*Wood* agt. *Smith*, 4 *Car. & P.*, 45.) In *Stone* agt *Denny*, (4 *Metcalf*, 151), it is said that the courts, in their later decisions, " manifested a strong disposition to construe liberally in favor of the vendee, the language used by the vendor, in making any affirmation as to his goods, and have been disposed to treat such affirmation as warranties whenever the language would reasonably authorize the inference that the vendee so understood it." In *Oneida Manufacturing Society* agt. *Lawrence*, (4 *Cowen*, 440). Chief Justice SAVAGE says : " There is no particular phraseology necessary to constitute a warranty. The assertion or affirmation of the vendor concerning the article sold must be positive and unequivocal. It must be a representation which the vendee relies on, and which is understood by the parties as an absolute assertion, and not the expression of an opinion." And generally, when the representation is not in writing, the question of warranty is to be sumitted to the jury. (*Duffee* agt. *Mason*, 8 *Cowen*, 25.)

It is not true, as sometimes stated, that the representation, in order to constitute a warranty, must have been intended by the vendor, as well as understood by the vendee, as a warranty. If the contract be in writing and it contains a clear warranty, the vendor will not be permitted to say that he did not intend what his language clearly and explicitly declares ; and so, if it be by parol, and the representation as to the character or quality of the article sold be positive, not mere matter of opinion or judgment, and the vendee understands it as a warranty, and he relies upon it, and is induced to buy by it, the vendor is bound by the warranty, no matter whether he intends it to be a warranty or not. He is responsible for the language he used, and cannot escape

liability by claiming that he did not intend to convey the impression which his language was calculated to produce upon the mind of the vendee.

Here it is not questioned that the language used was sufficient to constitute a warranty that the article sold was sound and in good order, and why should it not as well extend to the character of the article? When a buyer purchases an article, whose true character he cannot discover by any examination which it is practicable for him to make at the time, why may he not rely upon the positive representation of the seller as to its character as well as to its quality and condition? I can discern no distinction in principle in the two kinds of representations, and yet it is claimed on behalf of the plaintiff that there is a distinction, and certain cases are cited to uphold it, which I will proceed briefly to consider.

The first is the celebrated case of *Chandler* agt. *Lopus*, (*Cro. Jac.* 4.) That was an action upon the case, and the plaintiff alleged in his declaration that the defendant sold him a stone, which he affirmed to be a bezar-stone, whereas it was not a bezar-stone. The defendant plead not guilty, and the plaintiff had a verdict. The case was taken by writ of error to the exchequer chamber, and it was there held that the declaration was not good, "for the bare affirmation that it was a bezar-stone, without warranting it to be so is no cause of action." The court say, "Every one in selling his wares will affirm that his wares are good, or the wares which he sells are sound; yet, if he does not warrant them to be so, it is no cause of action." This was the reason assigned for the decision. It was not denied that the defendant would have been liable if he had warranted the stone, but a mere affirmation was held not to be a warranty. No distinction was made between an affirmation as to the character of an article and an affirmation as to its condition or quality. The doctrine laid down is, that a mere affirmation or representation as to the character or quality of goods sold will not constitute a warranty; and that doctrine has long since

been exploded, and the case itself is no longer regarded as good law in this country or England. (*Hilliard on Sales,* 237, *note*; 2 *Kent's Com., Comstk's ed.,* 633, *note a*; 2 *Smith's Leading Cases,* 5 *Am. ed..* 238; *Bradford* agt. *Manly,* 13 *Mass.,* 139; *Howe* agt. *Denny,* 4 *Metcalf,* 151.)

The case of *Seixas* agt. *Wood,* (2 *Caines,* 48), seems to have been decided mainly upon the authority of the case of *Chandler* agt. *Lopus.* That was an action on the case for selling peacham wood for brazilletto, the former worth hardly anything, the latter of considerable value. The defendant advertised the wood as brazilletto; showed plaintiff the invoice in which it was so described, and billed it to the plaintiff as such. The plaintiff had a verdict subject to the opinion of the court, and the court held that there was no expressed warranty, and that the defendant was not therefor liable. There was no intimation in the opinion delivered that there was any difference between a warranty as to the character of an article sold and warranty as to its condition and quality. The court simply held that the representation on the part of the defendant did not amount to an express warranty. They were laying down broadly the common law doctrine of *caveat emptor* and combating the implied warranties of the civil law. Hence great stress was laid upon the requirement of an *express* warranty. The rule, as thus laid down has been thoroughly overturned since the courts hold that any positive affirmation or representation as to the character or quality of an article sold, may constitute a warranty. The case has been much questioned, and can no longer be regarded as authority for the precise point decided. (2 *Kent's Com., Comstk's ed.,* 633; *Howe* agt. *Denny,* 4 *Metcalf,* 151; *Henshaw* agt. *Robins,* 9 *Metcf.,* 83, 89; *Brainard* agt. *Spring,* 42 *Barb.,* 470; *Hart* agt. *Wright,* 17 *Wend.,* 267, 271; *Barrkins* agt. *Becan,* 3 *Serg. & R.,* 37.) The case holds that a vendor is liable upon an express warranty of the character of the article sold, and the more recent cases hold that a positive affirmation understood

and relied upon as such by the vendee, is an express warranty.

The case of *Swett* agt. *Colgate*, (20 *Johns.*, 196), is quite analogous to the case of *Seixas* agt. *Woods*, and was decided mainly upon the authority of that case. The defendants purchased at auction, goods invoiced, advertised and sold as barillo, when, in fact, it was kelp, a much inferior article. It came before the supreme court upon a case containing the facts, and the court exercising the province of a jury, drew the inference from all the facts of the case that there was no warranty; laying down, however, the rule, that if there had been a warranty the vendors would have been liable. No intimation is contained in the case that there is any difference between an affirmation by the vendor as to the character of the article sold and one as to its quality or condition. Upon the same state of facts, as the law is now settled, it would be a question of fact for the jury whether or not there was a warranty.

The cases of *Seixas* agt. *Wood*, and of *Swett* agt. *Colgate*, have been frequently cited in our courts, and have, doubtless, influenced, and, it may be, controlled the decisions in other cases. The propositions of law announced in them are sufficiently correct; but in view of the rules of law as now settled in this and other states, I am of opinion that the law was not properly applied to the facts appearing in those cases.

Here, then, was a positive representation, that the article sold was blue vitriol, the plaintiff meant the purchaser to understand that it was blue vitriol, and he sold it as such. The defendants relied upon the representation, believing it to be blue vitriol, and bought it as such. If, upon these facts, the court was not authorized to hold as matter of law that there was a warranty, it was at least bound to submit the question of warranty to the jury. In *Allen* agt. *Lake*, (18 *Adol. & Ellis*, *N. S.*, 561), the defendant sold plaintiff a parcel of turnip-seed and gave them a sold note, in which it

was described as "Skirving's Swedes." It proved not to be such, but of an inferior and spurious kind. The court of Queen's bench held that the statement in the sold note was not mere representation or matter of description, but that it amounted to a warranty that the seed was Skirving's Swedes. In *Bridge* agt. *Wain*, (1 *Starkie*, *N. P.*, 410), the defendant sold to the plaintiff a quantity of scarlet cuttings intended for the Chinese market, and which were understood among merchants to mean cuttings of cloth only without mixtures of serge or other material; and it was proved that the article sold contained a quantity of serge, and that a part consisted of much smaller shreds than that usually sent to China, and that it would be very unprofitable, if not wholly unsaleable. There was no special warranty, but it appeared that in the bill of parcels the goods were described as scarlet cuttings; and Lord ELLENBOROUGH ruled if they were sold by the name of scarlet cuttings and were so described in the invoice, an understanding that they were such would be inferred. In *Power* agt. *Barham*, (4 *Adol. & Ellis*, 473), the action was for breach of warranty on the sale of pictures. It was proved, among other things, that the defendant, at the time of the sale, gave the following bill of parcels: "Four pictures, views in Venice. Canaletto, £160." The judge left it to the jury, upon this and the rest of the evidence, whether the defendant had contracted that the pictures were those of the artist named, or whether his name had been used merely as matter of description or intimation of opinion. The jury found for the plaintiff, saying that the bill of parcels amounted to a warranty. The King's bench held that the question of warranty was rightly left to the jury, and that the verdict should not be disturbed. Lord DENMAN says: "It was for the jury to say, under all the circumstances, what was the effect of the words, and whether they implied a warranty of genuineness or conveyed only a description or an expression of opinion." In *Barrekins* agt. *Bevan*, (3 *Serg & Rawls.*, 37), ROGERS, J. says:

" From a critical examination of all the cases it may be safely ruled that a sample or description in a sold note, advertisement, bill of parcels or invoice, is equivalent to an express warranty that the goods are what they are described or represented to be by the vendor." In *Bradford* agt. *Manly*, (13 *Mass.*, 144), Chief Justice PARKER refers to a case which came before him at *nissi prius*, of which he says : " An advertisement appeared in the papers, which was published by a very respectable mercantile house, offering for sale good Caraccas cocoa. The plaintiff made a purchase of a considerable quantity and shipped it to Spain, having examined it at the store before he purchased ; but he did not know the difference between Caraccas and other cocoa. In the market to which he shipped it there was a considerable difference in favor of Caraccas. It was proved that the cocoa was of the growth of some other place, and that it was not worth so much in that market. I hold that the advertisement was equal to an express warranty, and the jury gave damages accordingly. The defendants had eminent counsel, and they thought of saving the question, but afterwards abandoned it, and suffered judgment to go." In *Henshaw* agt. *Robins*, (9 *Metcalf*, 83), it was held in a case quite analogous to the one now under consideration, that when a bill of parcels is given upon a sale of goods describing the goods, or designating them by a name well understood, such bill is to be considered as a warranty that the goods sold are what they are thus described or designated to be, and that this rule applies, though the goods are examined by the purchaser at or before the sale, if they are so prepared and present such an appearance as to deceive a skillful dealer.

It can make no difference that in most of the cases cited the desription of the article sold was contained in a sold note or bill of sale. The same affirmation made orally must, upon principle, have the same force and effect.

I, therefore, reach the conclusion, both upon principle and authority, that upon the facts of this case a jury might

properly have inferred that there was upon the sale a warranty, that the article sold was blue vitrol.   It was, at least, the duty of the court to have submitted the question of warranty to the jury.   I think the facts were so clear and undisputed that the court could, without error, have decided as a question of law that there was a warranty, but this it is unnecessary to decide upon this appeal.

The only remaining question to be considered is whether there was a breach of this wartanty, and this can need but little discussion.   The article sold, if it was known at all in market, was known by another name.   It had only from 17 to 25 per cent. of blue vitrol in it.   It was not an inferior article of blue vitrol, but a different substance with a small admixture of blue vitrol.

The judgment should therefor be reversed and a new trial granted, costs to abide event.

EARL, C. reads for reversal; all concur; judgment reversed; new trial granted; costs to abide event.